[Civ. No. 11418.    First Appellate District, Division Two.—November 29, 1940.]

JAMES T. GILLETTE, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation) et al., Respondents.

Timothy Healy and Henry A. Plattner for Appellant.

John J. O'Toole, City Attorney, and Henry Heidelburg, Deputy City Attorney, for Respondents.

STURTEVANT, J.—The plaintiff commenced this action to recover damages for injuries sustained when one of the cars operated by defendant City and County ran over and crushed one of his legs. The defendants answered and the action was tried before the court sitting with a jury. The jury returned a verdict in favor of the defendants and from the judgment based on that verdict the plaintiff has appealed.

The accident occurred near the intersection of Second and Market Streets. Second Street intersects Market Street on

the south side. On Market Street there are four street railway tracks. The Market Street Railway Company uses the two middle tracks and the Municipal cars use the two outer tracks. The distance between the Municipal track and the Market Street Railway track is six feet. The over-hang of the cars, including both systems, is three feet nine inches. Between the Municipal car and the Market Street Railway car the clearance is two feet three inches. Pedestrians sometimes stand in the space between the two cars while the cars are in motion. At about 7:30 P. M. on the evening of August 10, 1935, car number 7 had come up Market Street and was in the act of taking the cross-over to the southerly Market Street Railway track. Car No. 5 had come down Market and stopped to allow car No. 7 to be operated as just stated. Car No. 21 had come down Market Street and stopped about five feet behind car No. 5. Car No. 31 had come down Market Street and stopped about five feet back of car No. 21. One of the ''C'' cars, operated by the municipality, was being operated toward the east on the southerly track occupied by those cars. A Yellow cab was being driven behind the ''C'' car traveling in the same direction. William Kitto, the conductor on car No. 5, was standing on the rear platform. Dr. Wilson, a passenger, was sitting on that car on a rear seat on its northerly side. The plaintiff Gillette was motorman on car No. 21 and was standing at the front end of that car. The defendant Godfrey was the motorman on the ''C'' car and was standing at the motor operating it as his car traveled to the east. The witness Beggs occupied a seat at the left of Godfrey and on the same side as car No. 21. The witness Campbell was driving the Yellow cab. The witness Owens was a passenger riding in the Yellow cab and was seated approximately in the middle of the back seat. While the Market Street Railway cars were stopped as above mentioned, the defendant Godfrey drove his car toward the east passing car No. 31, car No. 21, and stopped about a car length ahead opposite car No. 5. In doing so the plaintiff was hit by the ''C'' car, he fell under one of the wheels, and suffered the injury complained of. The plaintiff introduced evidence to the effect that when his car came to a stop he leaned out of the car and conversed with Kitto. That a little later he stepped out of his car, around to the south side of car No. 5, took hold of the middle stanchion with his right

hand, that Kitto had hold of the same stanchion with his left hand, and the two were conversing when the plaintiff was struck. The plaintiff then stood one foot from the step of car No. 5 and was facing northeast—his back turned to the Municipal track. The defendants introduced evidence to the effect that the plaintiff was not standing in the street but that he was leaning out of the side of car No. 21. The testimony of the eye witnesses is distinctly conflicting. A physical fact not controverted is that at the front end of the "C" car there are three handles. One of the handles on the left hand side of the front end of the car was broken in the middle at the time of the accident. It was the theory of the plaintiff that the "C" car was operated at a speed in excess of that prescribed by law and that its gong was not sounded. An ordinance of the City and County of San Francisco limits the speed of street cars at the point where the accident occurred to a speed not exceeding fifteen miles per hour. There was evidence the "C" car was operated at a speed of twenty-five to thirty miles per hour but there was also evidence it was being operated at a speed between ten or twelve miles an hour. There was evidence that as the "C" car proceeded down Market Street and as it passed car No. 21, no gong was sounded. However there was also evidence that as it proceeded by said car the gong was being continuously sounded. There was evidence that as the "C" car proceeded down the street the plaintiff Gillette was seen standing in the street. In that connection it should be noted the plaintiff called the defendant Godfrey as a witness under section 2055, C. C. P., and while giving testimony he testified that "The weather and visibility were good. I could see all the way from Twin Peaks to the Ferry. My eyesight was good. The only thing to obstruct my view from my platform to the Ferry were some people who got off a 17 car. They were standing on the municipal tracks. There was nothing else between my car and Sansome Street except that there were some people standing in the safety zone at Sansome Street. I was looking straight ahead but I did not see Mr. Gillette at any time." Both Campbell and Owens, riding in the cab, did not see Gillette until they saw him under the car wheels. Both were looking straight ahead and had a clear view between the Municipal car and the Market Street Railway cars. If he had been standing in Market Street talking to Kitto he would

have been directly in line of the vision of each. Witnesses testified they saw Gillette lean out of his car. If he did so the instant the "C" car passed by his car, and leaned far enough, the accident could have so happened as to break the car handle as above mentioned. Godfrey testified the accident happened in that manner. So did the witness Campbell. Such facts were evidence of an unavoidable accident. From the foregoing facts it must be conceded there was an abundance of evidence supporting the verdict returned by the jury.

██ The plaintiff claims the attorney for the defendants was guilty of misconduct which constituted prejudicial error. We have numbered the claims 1 to 13 inclusive. He claims when the jury was being selected the defendants' counsel asked: "(1) Do you know any of the attorneys for the Market Street Railway? (2) Have you any bias or prejudice against the City and County of San Francisco because the City and County of San Francisco endeavored the best it could to keep the Market Street Railway Company from being allowed to charge a seven cent fare? (3) Have you any bias or prejudice against me individually because I conducted the fight against the one-man car system? (4) If it further appears that the Market Street Railway paid all the doctors' bills in this case—? (5) If the doctors tell you that their bills have been paid by the Market Street Railway, would that cause you to be biased or prejudiced against the City and County of San Francisco?" Plaintiff also complains that of some of the witnesses these questions were asked: "(6) You have not paid any of those doctors any money, have you? (7) Do you know who has paid those doctors? (8) Did you give any written statement to the Market Street Railway concerning the occurrence of the accident?" Plaintiff further contends that counsel, in the presence of the jury, stated: "Their names (Owens and Campbell) were handed to the Market Street Railway, and they were also handed to the Municipal Railroad. (9) I was going to ask if he gave his name to the police officer. (10) We all know Officer Foley wrote out a police report and those police reports generally contain the names of witnesses. (11) There was only one independent witness produced by the Market Street Railway Company, and I told you there would be only one, notwithstanding the fact that the Market Street Railway had other

witnesses. (12) Now I don't accuse him of lying, because it is very easy to imagine certain things are true. It is true where your treasure is, that is where your heart is too. They possibly think they remember, but every bit of testimony they give is from the Market Street's and Gillette's standpoint in this case. (13) There is a conflict here, and according to the Market Street Railway's theory—.'' The plaintiff contends that each claim presents a reversible error and that the errors were repeated and continued throughout the trial. To these contentions there are several different answers. In the trial court there was no assignment of error as to propositions 1, 6, 7, 8, 9, 10, 11, or 13. There was no objection as to 4, 5, 9, 10, or 13. There was no request made to the trial court to admonish the jury regarding 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, or 13. As to number 4, a request was made and it was promptly granted. Expressing no approval whatever of the conduct of counsel, nevertheless on the record as made the plaintiff may not complain. (*Kershaw* v. *Tilbury*, 214 Cal. 679, 690 [8 Pac. (2d) 109].) ■ Moreover, considering each purported assignment in the light of the issues that were before the court, it is patent all references to the Market Street Railway Company were not objectionable. (See Labor Code, secs. 3850–3862.)

■ A complaint is made because the trial court gave two instructions on the subject of unavoidable accident. The plaintiff claims that under no view of the evidence was the accident unavoidable. As we have shown above we think there was.

■ The court instructed the jury as follows: ''I instruct you that the law presumes that the plaintiff Gillette saw that which, in the exercise of ordinary care, he could have seen.'' The plaintiff contends the instruction was contrary to the evidence. Not so. There was no direct evidence as to what Gillette saw.

■ Instruction No. 38 told the jury that the fact the plaintiff was struck did not raise a presumption the defendant was negligent. That was sound law. (19 Cal. Jur. 707.)

■ Acting on the request of the defendants the trial court gave Instructions 31, 50, and 55. They were as follows:

''31. Where the evidence is as consistent with a neglect of duty or care on the part of the injured person as it is with

a · neglect of duty or care on the part of the person charged with causing the injury, the injured party cannot recover in an action for damages for the injuries sustained.

"50. The tracks of a street railway company are in themselves a sign of danger and one standing in the vicinity of the tracks of a street railway company must exercise his faculties of sight and hearing and watch and listen for cars traveling in his direction. If he fails so to do and in consequence thereof is injured, he is guilty of contributory negligence and cannot recover against the street railway company.

"55. Plaintiff herein had no legal right to voluntarily place himself in a position of danger, if any, or to maintain said position if you believe that he had an opportunity of escaping therefrom by the exercise of ordinary diligence, and if you find from all the evidence in this case that plaintiff herein did place himself in a position of danger and maintained that position after opportunity to escape therefrom, such acts and conduct upon the part of plaintiff herein, if any, constitute negligence upon his part and prevent his recovery of damages in this case."

The plaintiff says that each was, in effect, a formula instruction. He also says that it has been debated whether No. 31 should ever be given. (*Sheldon* v. *James,* 175 Cal. 474 [166 Pac. 8, 2 A. L. R. 1493].) But when, as in this case, a plaintiff relies principally on the application of the doctrine of the last clear chance, he contends the giving of each of the instructions constituted prejudicial error. That contention must be sustained. Each instruction wholly ignored the element of proximate cause. Each was, in effect, an instruction to the jury, under the conditions specified in each instruction, to bring in a verdict in favor of the defendants. But that was not the law. ■ Although the plaintiff may have been negligent, if his negligence was not a proximate cause of his injuries it did not constitute a defense. (19 Cal. Jur. 561.) "So even though a person has negligently placed himself in a position of danger, he may recover provided the one who injures him, upon observing his position of peril has the last clear chance to avoid injury; and if an injury has occurred only through or by means of some intervening cause, from which the injury follows as a direct and immediate consequence, the law refers

the damage to the last cause and refuses to trace it to that which was more remote." (19 Cal. Jur. 562.) The rule last stated was directly applied by Instructions 56, 57, and 58, which were given of the trial court's own motion. They were correct statements of the law applying the doctrine of the last clear chance. They were in direct conflict with Instructions 31, 50, and 55. ██ When, as here, instructions in direct conflict on a material factor in one's case have been given, the judgment must be reversed for it cannot be known whether the jury followed the correct or the incorrect instructions. The defendants resist the attack by calling to our attention the fact that the trial court also instructed the jury that all of the instructions were to be read together. That fact is not helpful. In effect, when the trial court gave the jury Instructions 31, 50, and 55, it told the jury to follow them. When it gave Instructions 56, 57, and 58, in effect it told the jury to follow them. And when it gave Instruction No. 1, "You are cautioned not to select a single instruction, or a portion of an instruction alone, but to consider all of the instructions in determining any issue in the case", it was not helpful. The jury could not follow two wholly inconsistent divergent lines which were directly in conflict. Under all of these circumstances the error is prejudicial and the judgment must be reversed. (*Starr* v. *Los Angeles Ry. Corp.*, 187 Cal. 270, 280 [201 Pac. 599].)

██ The plaintiff requested the trial court to give two instructions on the last clear chance doctrine. It refused but of its own motion gave three instructions on said subject. The plaintiff complains because one of those instructions contained a provision, "That the defendant had *actual* knowledge of plaintiff's perilous situation." The complaint is without merit. (*Herbert* v. *Southern Pacific Co.*, 121 Cal. 227, 232 [53 Pac. 651].)

As shown above the plaintiff's case contained facts from which it could be claimed that he was guilty of contributory negligence. But it is equally clear he contended at all times that his acts were not a proximate cause of his injury and that at all times he contended the doctrine of last clear chance was applicable. Those contentions were of the gravamen of his case. The evidence was sharply conflicting and, as we have shown, Instructions 31, 50, and 55, took from the jury the consideration of those contentions.

It follows that the judgment must be reversed and it is so ordered.

Nourse, P. J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 28, 1940.